Baldwin, J.
The law gives no general lien to creditors upon the property of their debtors, though it enables them to obtain satisfaction therefrom by the proper judicial proceedings. It does not restrain a man’s dominion over his own property so long as he acts with fairness and good faith; but it treats as null and void all fraudulent contrivances to screen it from the pursuit of *33 his creditors. It is fraudulent to defeat them by reservations of benefits to himself: it is equally fraudulent to defeat them by benefactions conferred upon others.
It is not the consideration, but the intent with which a conveyance is made, that makes it good or bad as against creditors. However valuable the consideration, if the conveyance be designed to delay, hinder or defeat creditors, it is void: and though the conveyance be voluntary, yet if made with fairness and good faith it is unimpeachable.
The intent with which an act is done may be a conclusion of law from certain facts, against which conclusion all other evidence is unavailing; or it may be a presumption of law from other facts which is prima farde only, and liable to be repelled by sufficient evidence.
If a man in insolvent circumstances, conveys away his property to strangers, or settles it upon his wife and children, the law concludes the design to bo fraudulent against his creditors, and all evidence to the contrary is idle or delusive; and so if he renders himself insolvent by a voluntary conveyance, however meritorious in itself merely. It is in vain to speculate upon his motives, or adduce evidence of an honest purpose. It may be that he has acted through ignorance or mistake or misconception. Apologies and excuses may be found to absolve him from moral turpitude, but to these the law cannot listen. He is bound to know his own circumstances and the just demands against him; and the injustice and wrong to his creditors are palpable and unquestionable.
On the other hand, if a man is in flourishing or unembarrassed circumstances, and exercises a reasonable and prudent discretion in gifts or advancements to his children, adapted to their wants and justified by his means, leaving an ample fund for the payment of his debts ¡ there can be no propriety in the conclusion of a *34 fraudulent purpose, from the mere fact of indebtedness the time.
Still, as it is difficult to ascertain the exact state of a man’s pecuniary circumstances at the time of his making a voiimtary conveyance, as the claims of creditors are strong, and the devices of fraud numerous and often plausible, there ought to be a leaning against the protection of property from the pursuit of creditors, and a preliminary presumption in their favour, throwing the bur-then of establishing the fairness and good faith of the transaction upon the adverse party. This he may do by satisfactory proofs of the donor’s ample resources, the moderation of his gift, and his freedom from embarrassment ; and in the attempt to do this, he may be met by marks or badges of a fraudulent purpose.
The foregoing propositions, it seems to me, are founded in natural justice, and conform to the principles of the common law, and to our statute law as derived from that of the mother country.
The English statutes enacted for the protection of creditors are 50 Ed. 3, ch. 6; 3 Hen. 7, ch. 4, and 13 Eliz. ch. 5; the last of which is so broad as to render any particular notice of the two former unnecessary. By the enacting clause of that statute, “ Every feoffment, gift, grant or conveyance, &c. of lands, tenements, hereditaments, goods or chattels, or of rents, &c. out of the same, by writing or otherwise, and every bond, suit, &c. had or made and contrived of malice, fraud, covin, collusion or guile, to the intent or purpose to delay, hinder or defraud creditors of their just and lawful actions, suits, debts, &c. shall be deemed and taken (only as against the person or persons, &c. whose debts, suits, demands, &c. by such guileful and covinous devices and practices as aforesaid, shall or might be in any wise disturbed, hindered, delayed or defrauded) to be clearly and utterly void, any pretence, colour, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.”
*35 This is plain language, and is clearly directed against conveyances or gifts made with a fraudulent or covinous intent, and against none other; and its meaning is, if possible, rendered more manifest by the terms of the proviso—thus condensed in our act of 1785, 1 Rev. Code, p. 373: “ This act shall not extend to any estate or interest in any lands, goods or chattels, or any rents, common or profit out of the same, which shall be upon good consideration, and bona fide lawfully conveyed or assured to any person or persons, bodies politic or corporate.” Good consideration here obviously embraces any that is meritorious; whether valuable, such as money or marriage, or good in a narrower sense, such as natural love and affection. 1 Story’s Eq. 347. But the consideration is important only because the absence of it may warrant the imputation of fraud: the bona fides, however, is all important, inasmuch as without it the transaction is null and void, whether with or without consideration, or whatever may be the nature of the consideration.*
*36 In the application therefore of this statute, the consideration upon which a conveyance has been made has no bearing, except upon the question whether it was made bona fide or with a fraudulent intent; and upon jhjrt question it has an important bearing. If made for a valuable and adequate consideration, there can be no presumption against the fairness of the transaction, and there must be satisfactory evidence of a fraudulent intent : but if made without consideration, or upon the consideration of natural love and affection, there is a presumption against it, if the party be indebted at the time, arising out of the higher consideration attributable to the demands of creditors. It is evident that there may be circumstances under which the presumption is conclusive. Whether it be conclusive under all circumstances, is a point upon which there has been a conflict of opinion. But I think the weight of authority is decidedly in the negative.
In Cadogan v. Kennett, Cowp. 434, 435, Lord Mansfield said: “ Such a construction of the statute is not to be made as will make third persons sufferers. Therefore the statute does not militate against any transaction bona fide, and where there is no imagination of fraud”.—“ A fair voluntary conveyance may be good, notwithstanding its being voluntary. The circumstance of a man being indebted at the time of his making a voluntary conveyance, is an argument of fraud. The question in every case is, whether the act is a bona fide transaction, or whether it is a trick and contrivance to defeat creditors.”
And in Doe v. Routledge, Cowp. 705, the same Judge said: “A custom has prevailed, and leant extremely, to consider voluntary settlements fraudulent *37 against creditors. But if the circumstances of the transaction shew it was not fraudulent at the time, it is not within the meaning of the statute, though no money ., ,, was paid.”
In Jones v. Boulter, 1 Cox’s R. 288, Lord Chief Baron Skinner said: “ There is no mention in the act of voluntary conveyances, and the question has always been, whether in the transaction there was fraud or covin. Here were creditors at the time, and this is always said to have been a badge of fraud. But if there are other circumstances in the case, that alone is not sufficient.” And Eyre, B. said: “ The 13th Eliz. is a wholesome law, plainly penned, and I wonder how artificial reason could puzzle it. An artificial distinction has entangled Courts of Justice, viz: that a voluntary conveyance of a person indebted at the time is to be deemed fraudulent.” There is certainly great force in this remark, when applied to a conclusive presumption of fraud from mere indebtedness.
In Salmon v. Bennett, 1 Conn. R. 525, the Court says: “Where there is no actual fraudulent intent, and a voluntary conveyance is made to a child in consideration of love and affection, if the grantor is in prosperous circumstances, unembarrassed and not considerably indebted, and the gift is a reasonable provision for the child, according to his estate and condition in life, comprehending but a small portion of his estate, leaving ample funds unincumbered for the payment of the grantor’s debts, then such conveyance will be valid against creditors existing at the time.”
In Hopkirk v. Randolph, &c. 2 Brock. R. 132, Ch. J. Marshall, in expressing his own views of the true construction of the statute, says, “ a construction which should under all circumstances comprehend every gift, merely because it was voluntary, might derange the ordinary course of society, and produce much greater injustice than it would prevent. A man, for example, of *38 great opulence owing some debts, feels himself bound to advance his children when they leave him to act for themselves, and to perform their own parts on the great theatre of the world. His own feelings and public opinion would equally reproach him, should he withhold from them those aids which his circumstances, and their education and station in life, would seem to require. A reasonable advancement under such circumstances, so far from being considered as collusive, or made with an intent to defraud creditors, would be obviously a provision required by justice and the common sense of mankind. If after a long lapse of time, the child having acquired credit in virtue of the estate in his possession and apparently his own, should as well as his parent become insolvent, all would admit the equity of his creditors would be stronger than the equity of the creditors of his father. But should he not become insolvent, but settle in life, marry in the visible possession of property given to him in good faith, as a reasonable provision made by an opulent parent, whose circumstances were not only unsuspected, but were in truth perfectly sound, the subsequent failure of that parent at a distant period of time, could not be reasonably connected with that advancement, so as to impress upon it the stamp of fraud. No fraudulent intent, no intent to delay or in any manner injure creditors could be inferred. The consequence could not be apprehended from the act, and therefore the act could not be considered constructively fraudulent. It would seem to be a fair disposition of property, a fair exercise of the power of ownership, and not I think within the statute of frauds, were that statute now first to be applied to such a case.”
These views of Ch. J. Marshall are in conflict with the opinion of Chancellor Kent, in Reade v. Livingston, 3 Johns. Ch. R. 481; in which that eminent Judge examined the subject upon authority, and came to the conclusion that the fair deduction from the cases is, that *39 “if the party be indebted at the time of the voluntary £ J ' settlement, it is presumed to be fraudulent in respect to such debts, and no circumstance will permit the debts to be affected by the settlement, or repel the legal presumption of fraud,” and “ the presumption of law does not depend upon the amount of the debts, or the amount of the property in settlement, or the circumstances of the party.”
This broad proposition, it seems to me, with great deference, goes beyond the cases he reviews, and is not warranted by a fair construction of the statute. It is open, I think, to the common sense objection of imputing a fraudulent intent, under circumstances repelling all possible imagination of fraud; and invading the lawful dominion which a man has over his own property, while acting in perfect good faith. If carried out to its legitimate consequences, it would, in cases of indebtedness to the most trivial amount, avoid the voluntary conveyance, not only as to the existing, but as to all subsequent creditors.
To this conclusion it brought Mr. Atherhf, who was an advocate for the same rule asserted by Chancellor Kent. He says, “ It can hardly be disputed, I presume, that this act makes fraudulent conveyances void against creditors generally; not merely against creditors whose debts arose before, or whose debts arose after the settlement; but against all the settler’s creditors, withoutany exception or distinction. Now, if the circumstance of being in debt at the time of making the settlement is to be considered as a proof of fraud as against prior creditors, the settlement is consequently a fraudulent settlement ; and being a fraudulent settlement, it must necessarily be void against all the settler’s creditors.” And he afterwards says expressly that a subsequent creditor may defeat a voluntary settlement by proving antecedent debts to ever so small an amount. Ath. on Mar. Sett. 215, 217.
*40 This last proposition, however, is denied by Chancellor Kent, who takes a distinction, not to be found in the statute, saying that “ the fraud in the voluntary settlement is an inference of law, so far as it regarded existing debts; but that as to subsequent debts there is no such necessary legal presumption, and there must be proof of fraud in fact, and the indebtedness at the time, though not amounting to insolvency, must be such as to warrant that conclusion.” The cases, it seems to me, do not justify this distinction, and Chancellor Kent himself says they are numerous to shew, that if the settlement be once set aside by the prior creditors, subsequent creditors are entitled to come in, and be paid out of the proceeds of the settled estate. And this Court has decided that subsequent creditors may come in whenever the settlement is impeachable by prior creditors, though it has not been actually impeached by them. Hutchison v. Kelly, 1 Rob. R. 123.
A discussion in detail of the cases reviewed by Chancellor Kent, would now be tedious and unprofitable, inasmuch as they have been carefully examined by Ch. J. Marshall, in Hopkirk v. Randolph, and by Judge Story in his work on Equity Jurisp. vol. 2, p. 350 to 360 ; and to their lucid and judicious views of them, (and the collection of all the English cases on the subject, in the opinion of senator Allen, in Seward v. Jackson, 8 Cowen 442, &c.) I need only refer. Judge Marshall considers the authorities as determining, as a general principle, that a voluntary gift is void as to creditors whose debts existed at the time the gift was made; but only as a general principle, and not as an inflexible rule. He quotes with approbation the case in Connecticut of Salmon v. Bennett, above cited: also the case of Jacks v. Tunno, &c. in S. Carolina, 3 Desauss. 1, in which Chancellor Rutledge said, “ Suppose, for instance, a person in this State being indebted, though to a considerable amount, is possessed of a large estate in houses in the city, gives *41 a small part of that property to his child or children ; or one similarly circumstanced and indebted, possessed of a considerable estate in land and negroes, gives a few negroes and some land to his children; and either the accident of fire in the city, or the death of his negroes, should reduce his estate so considerably as to occasion his insolvency—would this Court, under such circumstances, merely because the person was largely indebted at the time of the gift, consider such gift as fraudulent, and set it aside because creditors were interested ? I apprehend not.”
Judge Marshall's view of the doctrine was, I think, sanctioned and substantially carried out, in Hinde’s lessee v. Longworth, 11 Wheat. 199; in which the Supreme Court held that, “ A deed from a parent to a child, for the consideration of love and affection, is not absolutely void as against creditors. It may be so under circumstances. But the mere fact of being indebted to a small amount would not make the deed fraudulent, if it could be shewn that the grantor was in prosperous circumstances and unembarrassed, and that the gift to a child was a reasonable provision according to his state and condition in life, and leaving enough for the payment of the debts of the grantor. The want of a valuable consideration may be a badge of fraud; but it is only presumptive, but not conclusive evidence, and may be met and rebutted by evidence on the other side.”
Judge Story resists the proposition of Chancellor Kent above stated, both upon reason and authority; and says, “ This doctrine is certainly strictissinii juris, and assumes as a principle of law, that the mere indebtment of a party constitutes per se conclusive evidence of fraud in a voluntary conveyance, in all cases where the creditors to whom he is then indebted are concerned.” He notices an observation of Chancellor Kent, that he had not been able to find the case in which a mere voluntary conveyance to a wife and child, has *42 been plainly or directly held good against a creditor at the time ; and in remarking upon it says, “ On the other hand, it may be assumed with some confidence, that there is no English case which pointedly declares that sucj], a conveyance is void, merely from the circumstance that the party was indebted at the time, if the debts bore no proportion to his assets, and there was no presumption of meditated fraud. The cases cited by Chancellor Kent, do not appear to me to reach the point; at least not in a form free from difficulty and obscurity.” He then proceeds to notice them particularly.
It would seem that the recent decisions of the English Courts do not attribute to the earlier cases the effect supposed by Chancellor Kent; and in fact assert a different doctrine. In Shears v. Rogers, 3 Barn. & Adolph. 362; 23 Eng. Com. L. R. 96, it was conceded by all the Judges-of the King’s Bench, that to render a deed void within the stat. of 13 Eliz. it ought to appear that the party at the time of making it was in insolvent circumstances; which however is to be determined, not merely by taking an account of his debits and credits, and striking a balance, but also by looking to his conduct, and the general state of his affairs. Lord Tenterden said, “ There is undoubtedly high authority for saying, that a party must be in insolvent circumstances to render a conveyance by him fraudulent within the stat. of Eliz., but that must not be understood as importing that a person may not render himself insolvent by conveying his property to one who is not a creditor.” That case is somewhat qualified by the case of Townsend v. Westacott, 17 Eng. Ch. R., 2d part, p. 240; in which a party largely indebted made a purely voluntary settlement, and became insolvent within three years. It was held that this was sufficient under the stat. 13 Eliz. to avoid a voluntary settlement; and Lord Langdale said, that it was not necessary to prove that the settler was in a state amounting to insolvency. That if it was *43 a conveyance executed for fraudulent purposes it ought to be set aside, but if the transaction was honest and without fraud it ought not to be interfered with: and that the existence of any debts was not sufficient. See also Gale v. Williamson, 8 Meeson & Welsby 405.
The doctrine of Reade v. Livingston has not been established in New York. In Verplank v. Sterry, 12 John. 557, 558, Spencer, Ch. J. expressed the opinion, that if a person making a settlement is insolvent, or in doubtful circumstances, the settlement, depriving his creditors of the means of satisfying their debts, comes within the statute: but if the grantor be not indebted to such a degree as that the settlement will deprive the creditors of an ample fund for the payment of their debts, the consideration of natural love and affection will support the deed, though a voluntary one, against his creditors ; and that such a deed being bona fide and upon good consideration, is saved by the express proviso of the statute. In Jackson v. Town, 4 Cowen’s R. 603, this opinion of Spencer is stated and expressly approved by the Court. But in Jackson v. Seward, 5 Cowen’s. E. 69, the contrary proposition of Chancellor Kent is stated and expressly approved by the Court. The judgment, however, in that case was reversed in the Court of Errors, and the doctrine of Chancellor Kent disapproved by Chancellor Jones and senator Spencer, and most of the senators who expressed their opinion on that point. Seward v. Jackson, 8 Cowen’s R. 406. And in Jackson v. Peek, 4 Wend. 300, the doctrine of the Supreme Court of the United States in Hinde’s lessee v. Longworth, and of Chancellor Jones and Senator Spencer, is approved by the Court.
The strong current of American decisions is certainly against the conclusive presumption of fraud from mere indebtedness. 1 Story’s Eq. p. 350 to 360, notes; 2 Kent’s Comm. 5 edit. p. 442, notes; cases cited in opinion of senator Allen, in Seward v. Jackson, 8 Cowen’s *44 R. 450, &c. But that matter need not be pursued further. Chancellor Kent himself, in the latest editions of his Commentaries, thus gracefully though reluctantly , , . „ . surrenders the question, so far as it rests at the present day upon authority. He says, “Judge Story evidently settles down upon the conclusion, under the stat. of 13 Eliz. that mere indebtedness at the time would not per se establish that a voluntary conveyance is void, even as to existing creditors; unless the other circumstances of the case justly created a presumption of fraud, actual or constructive, from the condition and rank of the parties, and the direct tendency of the conveyance to impair the rights of creditors. I have no doubt that such is the tendency of the decisions, both in England and America ; and that the conclusions of fraud are to be left as matters of fact to a common jury. The doctrine in Reade v. Livingston, and of the English Chancellors on whom it rested is, as I greatly fear, too stern for the present times.” Stern indeed! for any times, when it has the effect of converting an innocent into a fraudulent intent, and creditors at large into incumbrancers. The remark of the learned author, that the conclusions of fraud are to be left as matters of fact to a common jury is, of course, not intended to import the exclusion in common law trials of proper instructions from the Court to the jury, upon the nature and effect of the legal presumptions applicable to the case.
There is nothing in the decisions of this Court which militates against the views thus presented. Chamberlayne v. Temple, 2 Rand. 384, was, as Ch. J. Marshall ■remarks in Hopkirk v. Randolph, the case of a voluntary conveyance of a very large portion of the donor’s estate, made by a person in embarrassed circumstances, to his infant children residing with him, who were not at the time in need of any immediate possession, and who were not in a situation to take the property out of his possession, which he still retained. The gifts were *45 not made to advance his children in the world, and it is difficult to conceive any motive for making them at the time, other than a desire to secure them for his children against the claims of his creditors. Under these circumstanccs, though he retained enough to pay all his debts, and lost a large portion of his personal estate, consisting of vessels and the slaves that worked them, by a calamitous accident, yet it was justly held that he had no right to throw upon his creditors the hazard of such an accident, and to provide for his family at their expense.
Woodley v. Abby, 5 Call 336, turned upon the condition to the power of emancipating slaves conferred by the statute, subjecting them to execution for debts contracted before their manumission ; and the only substantial question was, whether the devastavit in that case was a debt within the meaning of the statute.
Hutchison v. Kelly, 1 Rob. R. 123, presented the question whether the voluntary deed in that case, made by a father to his children, was fraudulent against a subsequent creditor; which involved the enquiry, 1st, whether the conveyance was fraudulent and void in regard to a prior creditor, and if so, 2dly, whether, by reason of that circumstance, it was also fraudulent and void as against the subsequent creditor. This led, in my opinion delivered in that case, to a statement and some discussion of what I considered the correct principles bearing upon those points, substantially the same with those above declared. Judge Stanard, it appears, dissented from my opinion on the first point, so far as it conflicts with the doctrine of Chancellor Kent, in Reade v. Livingston ; but that the other Judges who sat in the cause did not, may be inferred from the subsequent case of the Bank of Alexandria v. Patton, 1 Rob. R. 499. And the latter case, in one aspect of it, presented the same points ; and in my opinion delivered therein, I restated explicitly the principles which I had endeavoured *46 to maintain in the former case, referring to the authorities and reasoning which had been relied on for that purpose; and the latter opinion, as appears from the report, received the concurrence of the other Judges who gat jn qie cause, and the approbation of Judge Brooke.
Upon the merits of the case before us, the principles I have rejected would have led me to the same result with those I have adopted; but I have chosen to vindicate the grounds on which I rest my opinion. This required the discussion of a doctrine somewhat entangled by slovenly reports and conflicting decisions. Let us now advert to the material facts disclosed by the record.
The voluntary settlement in question was made by a young man of imprudent and dissipated habits, a few years after he had attained his majority, and who in that brief period had become greatly embarrassed in his circumstances, deeply involved in debt, pressed to extremity by executions, and threatened with ruinous sacrifices. About these facts there is no controversy: in truth they are urged by both parties. In this state of things, he obtains the means of partial and temporary relief "from a friend, and executes the deed now impeached, by which he conveys to that friend as trustee, a large and valuable portion of his real estate, to wit, the tract of land on which he resided; to be held by the trustee free from the debts, contracts, &c. of the grantor, “ whether then existing or thereafter to be incurred,” for the support, maintenance, comfort and enjoyment of “the grantor’s family,” during his life; and after his death, to the use and benefit of such person or persons as he by his will should direct and appoint; and in default of such direction and appointment, to the use of such person or persons as would be in law entitled to the same, in case he had died seized of the legal estate therein. The deed also contains provisions authorizing the trustee to commit the management of the property so conveyed to Mr. Hunter, the grantor, or any other per *47 son, in his discretion; giving to the trustee, with the concurrence of Mr. Hunter, the power to make sale of the property, and reinvest the proceeds upon the same trusts; exonerating the trustee from any responsibility for mismanagement, misappropriation or misapplication of the funds by any agent appointed by him; the trustee undertaking only to execute the trust fairly and without fraud on his part, and without compensation.
In the case of a gift or advancement to a child by a parent, if it be made to appear that the donor was in prosperous or unembarrassed circumstances, and the gift or advancement proper and reasonable under the circumstances, the fair inference is, in the absence of proof to the contrary, that the only purpose was to confer a benefit upon the donee, without any thought of thereby jeoparding the claims of creditors. But in the case before us we are not merely left to the contrary inference from the embarrassed and harassed condition of the donor, but it plainly appears from the face of the settlement that a risk of loss on the part of creditors was foreseen and contemplated, and moreover provided for, not by furnishing security to them, but by expressly securing the donees against their demands. It is true the deed asserts as a reason for this unusual provision, that the grantor “ was seized and possessed of ample other estate sufficient to pay and satisfy all his just debts.” But of this there is not sufficient evidence. Though we have a detailed statement by Mr. Tucker in his answer and deposition, of the value of Mr. Hunters estate over and above the property conveyed by the settlement, by which he makes the amount 26,000 dollars; yet a considerable portion of it consisted of reversionary interests, which could not be subjected to process of execution; and we are not informed of the extent of incumbrances upon it, nor of the amount of the grantor’s indebtedness, except by his own loose and vague estimates, in his communications with Mr. Tucker, of ten *48 or twelve thousand dollars. But suppose it were established by the evidence that the grantor, at the time of the settlement, had ample resources, if properly and ju¿jcjolJsiy managed and applied, to meet ultimately all demands against him then existing; still it must be borne in mind that an enquiry of this kind is not a mere matter of debit and credit. In the grantor’s own apprehension of his affairs, they were greatly embarrassed. And what right had he, with the pursuit of his creditors in view, to withdraw therefrom an important part of his estate, and require them to look only to the residue; thereby increasing the risk of loss from his wastefulness and mismanagement, and imposing upon them the necessity of a more active diligence than that which the law prescribes ? Situated as he was, the best and only proper evidence he could furnish that his estate over and above that reserved for his family, was sufficient for the discharge of all his just debts, was the application of it for that purpose, and it would be idle to say that he had enough, if he had chosen so to apply it.
But this is not the case merely of a gift or advancement from a parent to a child. It is a case of voluntary postnuptial settlement, for the support and maintenance, comfort and enjoyment of the grantor’s family during his life, and after his death to the use and benefit of his devisees or heirs. The support and maintenance provided for was not merely of the grantor’s then wife, and his infant children then in esse, but embraced all future wives and all after born children. It extended to adult as well as infant children while members of the grantor’s family, and it made no absolute provision for either wives or children after his death. He had the power to give away by last will and testament the whole of the property to strangers, and so leave his family utterly destitute. It was only in the event of his intestacy that his descendants were to take the estate, and then to take the whole, though not formally, yet substantially as his *49 heirs at law, but leaving nothing for a surviving wife, unless upon an implication of her being entitled to dower. In truth, the effect of the settlement was to relieve the property from the debts of the grantor, to ere-ate an estate for his life for the enjoyment of his family, (in which as the head of it he could not but by his own self denial fail to participate,) to reserve to him an important attribute of ownership over the remainder, if he should choose to exorcise it, and to secure it to his devisees or heirs exempt from the obligations of their ancestor. At the same time, it is obvious from provisions of the deed already noticed, that it was not contemplated to take from the grantor the management, or even mismanagement of the estate during his life, unless by way of shield against the assaults of creditors.
I cannot doubt that the law condemns the settlement in question as fraudulent and void against the creditors of the grantor. At the same time, I impute no unworthy motives to Mr. Tucker, his trustee, friend and adviser. The latter had no personal interest to subserve, and was prompted evidently by a disinterested and affectionate regard for his young and imprudent relative, in the effort to save him from utter ruin. But he erred in not prescribing as a preliminary or concomitant of the proposed arrangement, that ample security should be provided for all existing liabilities. He says, and there is no reason to question it, that Mr. Hunter gave every assurance of his intention to discharge them out of his other property. It was not safe, however, as the result has shewn, to confide in such assurances, though it may be doubted whether more could have been obtained, or if so, made effectual without an intrusion into the management of his whole financial concerns. 1 say this without ascribing to Mr. Hunter any moral depravity. His extreme indiscretion seems to have been the source of his misfortunes, and the bane of his genius and merits.
*50 The debts sought to be recovered in this suit by the appellee Waite are completely established by the obligations and judgments exhibited ; and the appellants have entirely failed in their effort to impeach them as founded on usurious or gambling considerations. There is nothing in the defence of the statute of limitations, the judgments having been kept alive by executions which beyond all doubt issued thereupon, whether in exact conformity therewith or not is immaterial. In fact, the executions did severally correspond in substance, though not in form, with the principal moneys, interest and costs for which the judgments were respectively rendered.
I deem it unnecessary to consider the objections which have been taken to the regularity of the proceedings, whether in the County or the Circuit Court, previous to the filing of the amended and supplemental bill. At the time of the filing of that bill, the Circuit Court had unquestionable jurisdiction over the subject, and having exercised that jurisdiction properly upon the merits of the case, as thereby presented, there is no error of which the appellants can complain, unless it be in the name of the bill.
I think the decree of the Circuit Court ought to be affirmed.
Stanard, J.
The first question in this case is, can the title, derived under a voluntary conveyance, without consideration deemed valuable in law; be maintained as valid and effectual against the claim of a creditor whose debt existed when the voluntary conveyance was made ? In support of the affirmative, the appellants rely mainly on the opinions given in the cases of Hutchison v. Kelly, 1 Rob. R. 123, and Bank of Alexandria v. Patton, Id. 499.
In the former case, considering that the question did not properly arise, I forbore to enter into the investigation of it; and on impressions derived from other inves *51 tigations, merely declared my dissent from the conclusions of the Judge who delivered the opinion on that question. That question is now presented for our deci- * A A sion, and has, been fully and ably argued ; and called on judicially to pronounce an opinion, I have felt it my duty to subject my former impressions to strict scrutiny; and with the aids afforded by the argument of the precise question made at the bar, and in the opinion given in the case of Hutchison v. Kelly, deferring to that argument all that cordial respect for the Judge who made, and those who may have concurred in it, least short of treating it as a binding authority, I have prosecuted the investigation of the question to ascertain how far that opinion is sustained by sound principles of law, or the judicial expositions of them, before that decision was made. That the decision ought not to be treated as a binding authority, follows from long established and consecrated rules, by which the weight and binding force of judicial opinions and precedents are graduated and determined. An opinion on a question not necessarily involved in the case decided, especially, a question not argued, however entitled to respect, has not the rank of a judicial precedent. Even when involved in the decision of the case, and argued, if material pre-existing decisions of the same question be overlooked in the argument, and are not under the notice of the Court, the decision has not the rank of a binding precedent. This results from the deference due to the injunction u stare decisis.” Well considered and solemn decisions of the precise legal proposition, by force of that injunction establish the law; and when it is shewn that a subsequent counter decision, without adverting to them, has been made, instead of being sustained, it stands condemned by the very injunction invoked in support of it. If on the review of the decision in question it should be ascertained that it is opposed by the great preponderance of judicial precedents, and still more, if it runs counter *52 to some of the elementary principles of law, it is our right, it is our duty to retract it, retrace our steps, and conform our judgments to those precedents, and restore the sway of the principles that may have been departed from.
The question as to the validity of the title derived under a voluntary conveyance when encountered by the claim of a creditor of the grantor, may arise, when the adverse claims of the parties are in several different predicaments ; and this diversity in the relations of the claimants, has justly caused a difference in the fate of the then rival claims. The debt may be due prior to the execution of the voluntary conveyance; or, the debt may have been contracted since the execution of the conveyance. And when the claim is of a subsequent creditor, to charge the property conveyed by the voluntary deed, the voluntary deed may have been made when the grantor was free from debt; or secondly, when he is in debt, but the debt small compared with his property; or though large, all those prior debts are discharged before the subsequent creditor asserts his claim; or thirdly, when a portion.of the prior debts remain unpaid, but are not so pursued as to place that creditor in a condition to allege that he is delayed or obstructed by the voluntary deed; or fourthly, when the prior creditor has asserted successfully his claim against the voluntary grantee, and vacated the conveyance. This classification will give a key to much of the apparent diversity of doctrine or dicta that may be found in numerous judicial opinions, in cases involving the questions between creditors and claimants under voluntary settlements of the debtor. I^will also serve to define the arena within which the struggles between such adverse claimants have taken place. The claim of an existing creditor, to charge the subject embraced by a voluntary conveyance is without the confines of that arena, if its limits are to be fixed by the numerous cases in the Courts of *53 Westminster, before or since the statute of 13th Eliza- ' beth. A diligent search has been fruitless to find one single case in which the title under a voluntary settlement, unaided by the accession of some consideration deemed valuable in law, has been sustained as valid against a prior creditor. The same result attended the researches of Chancellor Kent, as he declares in the case of Reade v. Livingston. Atherly, in his treatise, p. 217, after propounding the question, can a prior creditor set aside a voluntary settlement without regard to the amount of the debt ? thus answers : “ My own opinion is that he can. Indeed it would be absurd to make the amount of the debt the criterion by which to judge of the fraudulency or bona fides of the settlement; nor do I find a single case in which it has been done. On the contrary, in all the cases I meet with the voluntary settlement has been unformly considered void against the prior creditors, without at all regarding the amount of his debt.” And in a note adverting to the influence that the existence and amount of debt at the date of the settlement, has on the right of the subsequent creditor to set aside the conveyance, he adds: “ Besides, with what regard to consistency, or the true construction of the act of 13 Lh Elizabeth, could a line be drawn as to subsequent creditors, if none is to be drawn as to prior ones: and with respect to prior ones such a thing certainly has never been thought of.” I quote Mr. Atherly, not as authority, or to adopt his opinions or reasoning, but as a witness to prove that his researches and experience have supplied no case in which a prior creditor has been made to yield to a title under a voluntary settlement; and that up to his time, as far as he knew, such a proposition had never been thought of. Such then, on these testimonies, which might be confirmed by specification of the eases, is the clear and uniform doctrine of the Courts of Westminster, for upwards of two centuries previous to the decision of the case of Reade v. Livingston, 3 *54 John. 381.. Had our own Courts, by a course of judicial precedents, departed from that doctrine ? On the contrary it had been recognized as free from doubt in earlier decisions of this Court; and in no case departed from, or indeed, as far as I am informed, seriously-questioned. The doctrine is thus stated by President Pendleton, in delivering the judgment of the Court in the case of Eppes v. Randolph, 2 Call 103: “ Where a creditor takes no specific security from his debtor, he trusts him on the general credit of his property, and a confidence that he will not diminish it to his prejudice. He has therefore a claim on all that property whilst it remains in the hands of the debtor; and may pursue it into the possession of a mere volunteer. But if he or his volunteer convey to fair purchasers, they having the law and equal equity, will be protected against the creditors.” This doctrine is cited, and recognized in the case of Coutts & als. v. Greenhow, 2 Munf. 363. The decision in the case of Woodley v. Abby, 5 Call 336, as I understand it, proceeds on the recognition by the whole Court, of this doctrine as unquestionable, and unless it be sound that decision is erroneous. The title under the deed of emancipation had obviously been urged as standing on higher ground and more stable than that of a donee claiming property under a donation, Judge Tucker, therefore, considers the question as if the title was not better than that of a do-nee of property, because if the title of a donee should under the circumstances, prevail against the creditor, a fortiori that under the deed of emancipation would. His opinion, that the title of the donee would prevail, is founded on the distinction between the rights of prior and subsequent creditors. While he does not question that the right of a prior creditor would prevail, he concludes that the creditor in that case had not shewn that his debt existed at the date of the emancipation: and even the subsequent responsibility was contingent. *55 Judge Carrington, who concurred with him, placed his judgment on the same foundation—Judges Roane, Lyons and Fleming, being of opinion that the responsibility had been incurred before the conveyance, though the amount was afterwards ascertained, on the doctrine that was unquestioned by any, that the title under a donation could not prevail against existing creditors, gave judgment in favour of the creditor. Two propositions are distinctly involved in the decision, viz: that a title under a deed of emancipation is in respect to the claims of creditors like that under a donation; and that donations in the hands of the donee remain subject to the claims of the prior creditors of the grantor. These cases, if not express adjudications establishing the doctrine, are at least significant indications of the opinions of the Judges of this Court, before the case of Hutchison v. Kelly, and they were not brought to the view of the Court that decided that case. In this connection I might refer to other opinions, not as authority, but as evidence of the strength and universality of the conviction of eminent men, that such was the sound established doctrine at least in this State. I will mention but two. The trustee in this case, under all the influence which his connection with it, and the parties interested in its fate, might naturally, fairly and honourably exert on the opinion he might form, standing justly on an eminence as a lawyer and a Judge, concedes in the pleadings that this doctrine is well established, and that the conveyance was given and taken on a conviction that the property remained chargeable by existing creditors. This concession would hardly have been made, had he not regarded the doctrine so clear that its opposite could not even plausibly be maintained. Judge Washington, who had his education, and obtained his professional distinction in this State—a distinction more than justified by his ability as a Judge, thus bears his testimony in favour of the same doctrine: “I have attentively considered *56 the numerous cases which relate to the subject, and with entire satisfaction I have come to the following result: a voluntary deed by a person indebted at the time to any amount, is fraudulent and void, as to such prior creditors, merely upon the ground that he was so indebted. But as to subsequent creditors, the deed is not void for that reason, because it does not necessarily, or even rationally, follow, that the conveyance was fraudulently made with intent to hinder or delay creditors who became such long after the deed was made.” Ridgway v. Underwood, 4 Wash. C. C. R. 130.
Such being the evidences furnished by judicial decisions of the Courts of England, from whence our jurisprudence is derived, by the decisions of the Courts and the opinions of eminent Judges and jurists of our State, I should not have felt myself warranted, when called upon to pronounce what the law is, in saying it was other than these evidences shew it to be, even if the decisions of Courts of other States or (following the suggestion of Judge Story, and taking up the question as res integra,) my own reasoning should countenance a different answer.
But is the preponderance of the adjudications in other States in favour of the condemnation of this doctrine; or regarding the question as res integra, unfettered by the authority of adjudged cases, and testing it only by the elementary principles of our jurisprudence, and sound rules of legal logic in the application of them, will the conclusion be hostile to the doctrine?
It is an elementary principle of our law, that the claims of justice are paramount to those of affection; and by the common law, unaided by the statute of Elizabeth, the rights of prior creditors are recognized and vindicated. By that law, all voluntary settlements were void as against existing creditors; but not as against subsequent creditors. Twyne’s Case, 3 Coke’s R. 83; Upton v. Basset, Croke’s Ch. 445; Dyer 294 b. This was the *57 legitimate offspring of the elementary principle which gave the claims of justice the ascendancy over those of blood or affection. As to the existing dej>t, the creditor has at the moment of the donation, a superior claim to the application of the property of the debtor, than that acquired by the donee ; and while their respective rights continued unchanged, how could their relative rank, in reason, be changed? And whenever they come into collision, how could that right, with this inherent infirmity from its origin, as compared with the opposing one, be made, with consistency and reason, to prevail over that which was prior in time and superior in rank ? How and when could this original, pre-existing superiority be lost, and the inferior one acquire strength to overcome it ? The right of the prior creditor rests on the principles of natural justice. Such was the doctrine of the civil law; 2 Kent 448; and is the law, I believe, of the civilized world. But in respect to the subsequent creditor, the doctrine of the common law was directly otherwise; and this diversity was supported.by sound reason, and elementary principles. By those principles, the owner of property might part with it by donation, and vest in the donee a .title thereto; and the donor had no right or power to divest that title directly or indirectly, by any subsequent act. If subsequent creditors had been permitted to charge it, the donor would have had the power at his will to defeat the donation ; and had such right been recognized in such creditor, the elementary principle which denied to the donor the power to retract the gift and divest the title' of the do-nee, would have been undermined and in effect abrogated. Every principle of law and reason denied the right of the subsequent creditor to defeat the prior donation. As to the subsequent creditor, the prior donation had divested the title of the donee before such creditor-had any right. In reason, his rights as creditor attached only to the property of the donor existing at the origin- *58 of the debt, dr while it remained unpaid. Hence at'the common law there existed indisputably, a clear distinction between prior and'subsequent creditors as they affect;e(j voilintary settlements or donations. As to prior creditors, they gave no title and were void; or in the phrase that became more familiar after the statute of Elizabeth, as indicating the same consequence, were fraudulent in construction of law, without enquiring into intent or the amount of the debt, or the circumstances of the debtor at the time of the settlement. As to subsequent creditors, they were valid, unless they were covinous or fraudulent in fact; and then even the eommon law in its abhorrence of covin, denying them all efficacy as to all persons other than the donor and donee, condemned the title set up under it in opposition to the claims of creditors, whether prior or subsequent. If this was the common law, having its roots in its elementary principlés, the right of the existing creditor to prevail-over the title of the donee continues, unless taken away by statute.'
The statute of Elizabeth is in terms declaratory, and not long after its passage we have the high authority of Lord Coke, Coke Litt. 290, and afterwards the opinion of Lord Mansfield, that it was but declaratory of the common law. Now, however this may be, if any proposition may be considered as sanctioned by the universal concurrence of all Judges, it is that the statute is to be construed liberally in favour of creditors, and certainly it has never been intimated that it was intended to limit or impair those rights.
The constrdction given in the case of Hutchison v. Kelly,, places all creditors prior and subsequent, on the same platform. It seems to me that such a construction is not justified by sound and well established rules for the interpretation of statutes.
What is the effect of that construction ? It is that no deed is void as to existing creditors, unless it be made *59 under circumstances that hy direct purpose and legal implication, the Court can so predicate fraud of it as to let in subsequent creditors; and that whereas by the common law the right of the prior creditors could not be successfully resisted by the donee, and that right was consummate without regard to the amount of the debt, or the circumstances of the grantor, this right is abrogated, unless the prior creditor can shew that the deed was fraudulent and void in the sense that would make it so as to subsequent creditors. By the common Jaw the prior and superior title of the existing creditor was prevalent over that of the donee ; and by this construction this right is denied unless on shewing that on which the conveyance would be void as to a subsequent creditor. The right of the prior creditor existing at and before the donation is cancelled, unless that state of things be shewn that other rights not existing and which may never arise, would be affected, and entitled to prevail. This construction deprives of its rank the common law right of the existing creditor, and reduces it to that of the subsequent creditor; and to a statute made avowedly to protect the rights and advance the remedies of creditors, is imputed the function of annulling the rights of one class having the highest title to favour by giving validity to a donation that before was void as to such creditors, unless it can be avoided by the strength sufficient to avoid it in favour of rights not then existing and that may never exist. Now, one of the fundamental rules of construction is, that common law rights and remedies are not taken away even by statutes professing to restrain or modify them, unless by the plain terms or by fair and necessary implication, and only to the extent the statute so provides.
It surely cannot be alleged that the statute, in express terms, reduces the common law right of the existing creditor to the rank of that of a subsequent one; and a construction that will produce that result, can only be *60 justified by reasonable implication that such was the intent. Now, can such an intent be reasonably implied? Is there not in the nature of things a palpable difference that in reason and justice assigns them different rights in their competition with the donee of their debtor? And has not that been made manifest by the brief exposition of the principles of reason and natural justice on which the common and civil law is founded ? At the risk of repetition I will revert to them. The prior creditor has an existing and superior right at the time of ■the donation, to claim that the debtor’s property shall be devoted to the debt, than the donee that it shall be given to him. The donor is under a higher obligation to pay his debt than to make the donation. If the property embraced by that donation become necessary to pay the debt and it be not liable to it, the donor will be protected in the violation of this higher duty, and the title of the donee, inferior in its origin, will be sustained in opposition to the superior one. Now, in respect to the subsequent creditor, the donor at the time of the donation was under no obligation to him; no duty to him was violated by the donation. He had no claim that rendered it improper in respect to him that the donor should divest himself of his property. Before his claim accrued the debtor had divested himself of the property, and therefore in reason and justice that claim could not attach to it; and the donee having acquired title before the creditor’s right existed, it was not subordinate to that right, which in its nature only charged the property of the debtor which he had a power over and was under a duty to apply to it. Besides, the very intent is implied from and indeed inherent in the act of donation, and is therefore truly and justly predicable of every donation in respect of subsequent creditors, and may even be distinctly avowed without impairing its validity, which if avowed or proved in respect to existing creditors would stamp it with fraud. Thus in every *61 donation the motive and intent in the very act is to withdraw it from the claim of subsequent creditors, and to disable the donor from subjecting it to his future debts. It is not to invade directly or contingently, any existing right that has attached, but to prevent any fature right from attaching. It does not act on existing rights, but prevents the existence of future ones. As to prior creditors, their rights exist, and the intention of the donor, in and by the act of donation, to withdraw the property from the payment of those debts is levelled at, and if successful, would destroy, in violation of the existing duty of the donor, the rights of the creditors. In respect to the one the right is defeated by the donation ; in respect to the other no right is invaded, for none over existed. It is not a reasonable implication that the statute intended to blend in one common fate and reduce to an equal rank, rights to which the common law and all the considerations of natural justice assign forces so unequal, and especially to produce that equality by depriving prior creditors of the rank which that law and those considerations had given it.
If, therefore, this were res integra, dependent on results of the application of the principles of law and of sound rules of construction, now for the first time to be applied, I should be conducted to the same conclusion to which I am brought by the adjudications of the English Courts, and the opinions extant before the case of Hutchison v. Kelly, of our Judges and jurists. When the decisions of our sister States are properly analyzed, distinguished and weighed, I think the preponderance will be found in favour of the same doctrine, and conform to rather than conflict with those of the Courts of Westminster and this State. For the proper appreciation of those decisions, and, as I think, to detect the source of error and develop the cause of their contrariety, and, indeed, of the diversity, real or apparent, in the opinions of the Judges in England, it is proper to *62 revert to the classification of the predicaments in which the claims of creditors and donees of the debtor were conflicting.
The construction that would reduce prior creditors to the rank of subsequent creditors, so far from receiving the approbation or countenance of any of the many able English Judges that have had to apply the statute in numerous cases during the lapse of more than two centuries, has not been so far as my researches extend, suggested in argument in the Courts of that country. On the contrary, the struggle, commencing at an early time, was by a most liberal interpretation in favour of all creditors indiscriminately, in disregard of some of the plain expressions of the statute, to raise subsequent creditors to the rank of prior ones, and to maintain that as the common law made voluntary deeds void as to existing creditors, the statute made them void as to all creditors. In the course of this struggle, the cases presented the creditors and claimants in the predicaments indicated by the classification I have before stated, and rival pretensions of creditors and volunteers in each of these predicaments became the subject of investigation and decision. In the predicament of subsequent creditors claiming, and a voluntary settlement by a party entirely free from debt, and no circumstance but that the deed was voluntary on which the claim of the creditors to vacate it was based, the broad question in efFect, was propounded, whether by force of the statute, the voluntary conveyance was void. A decision in favour of such pretensions, it is obvious, would have maintained the broad and as I think extravagant construction of the statute by which subsequent creditors were raised to the rank of prior ones, and as the common law avoided the conveyance as to prior creditors, the statute avoided the like conveyance as to all. Strong as was this construction, it was countenanced by so many early dicta or adjudications, that Atherly, in his comparatively recent publi *63 cation, espouses that doctrine and devotes a chapter to the discussion of it and review of the authorities on the question. This doctrine, however, was long since and I think most properly renounced. The question arising on the claims of subsequent creditors to set aside voluntary settlements on the ground that the grantor was indebted more or less at the date of the settlement, has been the great theme of contention in the English Courts from the time of Lord Hardwiclee to modern times. It seems to have been decided at first, that indebtedness at the date of the voluntary settlement was per se sufficient to entitle all creditors prior or subsequent, to impeach it; but that was soon modified, and the fact that security was given for the prior debts taken as sufficient to repel the claim of the subsequent creditor. Afterwards, the further qualification was introduced, by which the extent of indebtedness, the amount of the settlement, and the proportion it bore to the fortune of the grantor, were declared proper to be considered in determining the validity of the settlement ; and then these being let in as elements to influence the solution of the question, much contrariety of opinion is to be found in the judicial and forensic discussion of the question. It is in reference to the question presented by the claim of the subsequent creditors to vacate the settlement on the ground of the indebtedness of the grantor at the time it was made that the arguments and opinions treating the extent of indebtedness, amount of settlement, and fortune of the grantor as proper subjects of consideration, originated. On that question they bear, and I think with even greater weight than has been allowed them. Much of the contrariety of opinion so conspicuous in the modern adjudications of our sister States, has arisen from erroneously transplanting the arguments and opinions from the question in which such considerations most properly enter and bear with decisive force, to another and wholly *64 different field of controversy, into which they have never been admitted by those with whom the doctrines inculcated by those arguments and opinions originated. Having in view the classification aforesaid of the predicaments jn which may be presented the claims of subsequent creditors, and with the key supplied by this hasty and imperfect review of the origin and bearing of the questions that have been agitated in Westminster Hall on these classes respectively, I proceed with a brief notice of the adjudications of the American Courts. The decisions that affirm the right of existing creditors, and distinguish between the force arid efficacy of the right of prior and subsequent creditors are Sexton v. Wheaton, 8 Wheat. R. 229; Reads v. Livingston, 3 John. Ch. R. 481; Lackyer v. De Hort, 1 Halst. R. 450; Thomson v. Dougherty, 12 Serg. & R. 448 ; Horne v. Ward,. 4 Greenleaf’s R. 195; Odaniel v. Crawford, 4 Dev. N. C. R. 197. Such, too, was the decision, though not expressly, yet constructively, of C. J. Marshall in-Backhouse and Jett, 1 Brock. R. 511; and, as I interpret it, the decision in Hopkirk v. Randolph. So also is Ridgway v. Underwood, 4 Wash. C. C. R. 67; and Jackson v. Seward, 5 Cowen’s R. 67. On the other side, the Courts of South Carolina, while they recognise a distinction between prior and subsequent creditors, in their title to impeach the conveyance, have decided that a donation or voluntary settlement may under circumstances be valid even against an existing creditor. There is a like decision in Connecticut. 1 Conn. R. 525. Justice Story in his treatise, has questioned the doctrine of Reade v. Livingston. Chancellor Walworth of New York, has also questioned it. 6 Paige’s R. 526. In support of the same doctrine, the cases in 11 Wheaton 199, and of the Court of Errors, 8 Cowen’s R. 406, reversing the judgment in the case, 5 Cowen’s R. 67, are also relied on, but I think neither of them has the authority or weight of a decision of the *65 question. As the case from 11 Wheat, is made in part the foundation of the opinion of Judge Story, and of this Court in the case of Hutchison v. Kelly, and is again relied on by my brother Baldwin, I will bestow a brief notice on it. That case came before the Supreme Court on an exception to the rejection of evidence of judgments in favour of creditors other than the parties, rendered against the grantor subsequent to the conveyance; and that evidence was offered to prove that the conveyance was actually fraudulent, or fraudulent in fact. On a question of actual fraud, many authorities had, and as I think most properly, established that the amount of indebtedness was a material matter; and the general proposition of Justice Thompson, as to the extent of the indebtedness, must, according to established rules, be referred to the case in judgment, and therefore it but maintains that the amount of debts and resources of the debtor are properly to be in evidence in the solution of the question of actual fraud. This interpretation of that part of the opinion is, I think, demonstrated by the reference to, and adoption of the doctrine of the case of Sexton v. Wheaton, 8 Wheat. R. 229, by the same Judge in the same opinion. Thus the main stay of Judge Story’s opinion is removed. The other is still more frail. The cases referred to are 12 John. 530; 4 Cowen 603. Neither of these cases involved the claims of creditors. They presented claims of subsequent purchasers, alleging their adversaries to be volunteers. I may here remark, the case in 12 John, is again relied on; and is, I think, the only authority vouched for the opinion expressed in Bank of Alexandria v. Patton, that a conveyance in consideration of blood or other meritorious consideration, if bona fide, is within and protected by the saving of the statute. I may say in passing, that though such an opinion is thrown out by C. J. Spencer, in the course of his judgment in that case, it is merely obiter-, as that Judge him *66 self treats it. For he expressly disavows it as the ground of, or influencing his judgment, and in the conelusion declares that his judgment rests solely on his conviction that the supposed volunteer was a purchaser for valuable consideration. We thus ascertain the infirmity of the foundation on which Justice Story has mainly rested his opinion. As to the decision of the Court of Errors, reversing the judgment in 5 Cowen, it leaves the doctrine of that case intact, but by the argument of two of the lay Judges of that Court; they decide the case on the ground mainly, that the conveyance in that case was one on valuable consideration. Besides they rest their dissent on the case in 11 Wheaton, which it has been shewn, does not sustain them, and on inferences from general dicta in the cases of Cadogan v. Kennet, Cowp. R. 432, and Doe v. Routledge, Cowp. R. 705, neither of which cases presented any such question. The total inefficacy of the decision as one 'overruling the doctrine on which it was decided by the Supreme Court, is distinctly demonstrated by Justice Bronson in the case in error, 18 Wend. R. 375. There remains, then, but the decisions of the Courts of South Carolina and Connecticut, opposed to the decision of the Supreme Court of the United States, of New York, Massachusetts, New Jersey, Pennsylvania and North Carolina.
It is said that Chancellor Kent has gracefully retired from the doctrine of the case of Reade v. Livingston. I do not so understand that part of the note to the last edition of his Commentaries, which has been quoted. But all doubt is dissipated when that part is taken in connection with the residue of the same note.
The opinion advanced in Bank of Alexandria v. Patton, that a meritorious consideration is a good consideration within the meaning of the saving of the statute, has had I think much influence (and ought if correct) in conducting to the conclusions of my brother *67 Baldwin in the case of Hutchison v. Kelly, and his judgment in this case. It therefore requires examination. With great deference, I entirely dissent from it; and I think that dissent is warranted by every previous authority, or even dictum, except that of Spencer in 12 John. R. 530, which I think I have shewn even in the estimation of that Judge was of little weight. Beginning with Twyne's Case, which distinctly expounded good, to mean valuable, there is no case that has fallen under my notice in the English reporters, in which that interpretation has been questioned. The cases are collected by Atherly, p. 191-206. And all support the conclusion which he unhesitatingly adopts, that a valuable consideration is necessary to bring the conveyance within the saving of the statute. It is said in the case of Bank of Alexandria v. Patton, that if good, be interpreted to mean valuable, the saving would be rendered nugatory. If this be so it furnishes a strong, and as an original question, an invincible argument for the rejection of the construction. But is it so ? That it is not so, I think is demonstrable. The function assigned to the proviso by the construction which makes a “ meritorious,” a “ good” consideration within the meaning of the act, requires that that consideration should come from the grantee, and exacts bona fides of the grantor. Now the bona fides required must either be that of both grantor and grantee, or that of the grantor, or that of the grantee singly. It cannot require that it should be the bona fides of both, for if that were so, then if the grantor meditated a fraud on his creditors, though the grantee paid full value, without participation in, or the slightest suspicion of the- meditated covin of the grantor, he would not be protected by the saving. Yet uniform decisions shew that such purchaser is protected, however covinous the intent of the grantor. It could not be the bona fides of the grantor, for it has just been shewn that though his intent be mala fide, if good con *68 sideration, that is, valuable consideration, passes from the grantee, and he acts bona fide, the conveyance is valid, and if meritorious be in the meaning of the statute equivalent to valuable, on what ground could a voluntary conveyance, made on such consideration, be set aside on the mala fides of. the grantor ? And why should not such a consideration with bona fides on the part of the grantee sustain the conveyance in spite of the mala fides of the grantor, as it does when there is the equivalent, on this interpretation, that is, a valuable consideration, and good faith in the grantees ? It may be safely affirmed that good faith is predicable of the grantees in deeds on meritorious considerations in ninety-nine cases in a hundred, and if meritorious be a good consideration within the meaning of the statute, this conveyance, and almost all other postnuptial settlements will be maintained.
What then is the function of the saving in the statute ? The bona fides it exacts is that of the grantee. Its important function, (as has already been shewn,) is to protect a purchaser for value, and bona fide, though the intent of the grantor be covinous by the clearest proof. Another of . its functions is to retain within the operation of the enacting clause conveyances though on valuable consideration, unless bona fide on the part of the grantee.
Nothing is better settled than that a conveyance though made on valuable and indeed full consideration may be covinous and fraudulent. This happens when the debtor concerts the means of defeating or delaying his creditors, and to that end, to divest himself of his tangible property, and to effect it, procures the aid of a purchaser who, with full knowledge of the purpose, and with a view to accomplish it, makes the purchase. In this he does not act bona fide, and though he gives full value, he is not protected by the saving in the statute. The saving protects him if he gives value bona fide, *69 though the intent of the grantor be covinous; but it does not protect him though he gives full value if his purchase be not bona fide.
Another function of the saving in the statute is to protect purchasers from volunteers, or even fraudulent grantees, the fraud being unknown to the purchaser, and he paying full value.
I have already alluded to the doctrine, at times advanced in the progress of the controversy involving the respective rights of creditors of the grantor and volunteers claiming under the debtor, that if the conveyance was void as to prior it was necessarily so as to subsequent creditors. I cannot but believe that the assumption that such is the established doctrine, and that the necessary consequence of upholding the rights of prior would be to expose the voluntary settlement to the claims of subsequent creditors, and thus leave every settlement, however fair and honest the intent, if the grantor was indebted at the time of the settlement, exposed to the future discretion or indiscretion and improvidence of the grantor, has had great force with those who have come to a judgment against the rights of prior creditors. If such were the consequence, I join in unqualified reprobation of the construction which involved that consequence. It is true, that cotemporaneous with the doctrine that any amount of indebtedness brought the conveyance within the denunciation of the statute, and exposed the subject conveyed to the claim of all creditors, the Courts treated what was denominated a fraud in construction of law, (which was but a mode of stating the subordination of the right of the donee to that of the creditor,) as equivalent to actual fraud. But the whole course of subsequent decisions reject the doctrine. They admit the distinction between prior and subsequent creditors ; and that distinction, on the plainest principle, involves the consequence that a prior creditor may have the right to charge the property embraced by the settle *70 ment, when the subsequent creditor has not. What incongruity is there in this distinction between the rights of these classes of creditors ? Such a distinction is an elementary principle of the common, as it is of the civil iaw_ Does not the cotemporary existence in the Courts of Westminster, of the doctrine that the prior creditor had a right to charge the donation without regard to the amount of debt, or the circumstances of the grantor, and that the subsequent creditor’s claim to impeach it may be repelled on evidence, and cannot be sustained except by direct proof, or fair legal implication, having regard to the circumstances of the grantor, of the fact that the settlement was as to the grantor mala fide, shew that there is no such incongruity. On the claim of the subsequent creditor, the state of indebtedness at the time of the conveyance is now but a circumstance, to be weighed with others, in determining the bona or mala fides in fact, of the conveyance.
There is no necessity to put aside the claim of prior creditors to avert the consequence, that if they prevail, fair, conscientious and reasonable family settlements will be exposed to the subsequent creditors of the grantor, and consequently indirectly to his power, and to his future misfortunes and improvidence. One of the strongest objections, if this question were res integra, to the doctrine that would make the title of existing creditors depend on the investigation of the state of the debts, property, family, and habits of the grantor, is, that it would, for the preservation of the rights of existing creditors, cause a facile implication of fraud from the facts and circumstances of each case, without which the debts would be defeated; or if more stringent proof was required, would hold out the strongest temptation to conveyances dishonest in fact, but of whieh the direct evidence could not be produced. If, of this dilemma the first member be chosen, then the enforcement of the rights of existing creditors will enure to the benefit of *71 subsequent ones; and thus while the volunteer, by it may be saved from a certain but small or perhaps no charge, he is exposed to the hazard of utter ruin from large and indefinite amounts of subsequent debt, which but for this facile implication of fraud to save the prior debt would not charge him. I think, policy and justice demand the most stringent proof of fraud in fact when a subsequent creditor claims to vacate a prior voluntary settlement; especially in this State, where conveyances affecting creditors are to be registered. It is thus only that the fair and honest purposes of such settlements, that of securing the property to the volunteers free from the future power of the settler, his misfortunes or improvidence can be assured. But if this stringent proof is required in respect to existing creditors, how strong is the temptation to one in failing circumstances, to provide, or make the effort to provide for his family at the expense of his creditors. If it be required to be shewn, (as I think it has been properly required on the claim of a subsequent creditor,) that the grantor was greatly embarrassed, or insolvent, or verging to insolvency, or that his debts bore a large ratio to his property, how difficult is this proof to the creditor; and how vague and indefinite, in general, it must be, except to the debtor himself, who will have the strongest motives for concealment; and then at last as part and parcel of this doctrine, the evidence covering this wide spread field, so little accessible to the creditor, and at best vague and general, must go to a jury; and the validity of the conveyance as an effectual ..bar to the honest claim of the existing creditor, submitted to the lottery of a decision by that tribunal. How many are the chances of that decision being in favour of the conveyance, when the result depends on convincing such a tribunal that the conveyance was mala fide; and the evidence to shew it so, is so little at the command of the creditor, when even against the strongest evidence, the jury act *72 ing on a system of their own. may conclude that fraud cannot be imputed to the act of a parent done in fulfilment of his natural duty, of providing for his household ; and when at the worst, if all the chances of this lottery should fall out against the volunteer, he is not in a worse condition in point of fortune than he would have been had the conveyance not been made.
I am deeply penetrated by the conviction that the conclusions in favour of the rights of the existing creditor are right; and in the language of the Supreme Court of the United States, “ that they are warranted, not only on the ground of authority, but by considerations of the soundest policy and wisdom.”
My opinion on the merits has been, and is intended to be confined to the question I have discussed. As a part of that opinion, I maintain that as to subsequent creditors, the conveyance should not be vacated, except on direct proof, or just legal implication from the evidence, of the fact that the conveyance was mala fide, or in the language of the cases fraudulent in fact. If I mistake not, on the principles of the opinion in Hutchison v. Kelly, and that given by my brother Baldwin, in this case, the deed being avoided on the circumstances that justify the legal inference of fraud as a fact, though no covinous intent be imputed, would expose the property to the claims of subsequent creditors. Now, thinking that the rights of prior and subsequent creditors have different degrees of merit, I mean not that that consequence shall be drawn from it. I have not investigated the question as to the intent in fact of the parties. I do not doubt that they were intrinsically upright and honest, and I reserve to myself the decision of the question, should a bill be filed by subsequent creditors to assail the settlement, how far they are liable to be repelled, notwithstanding the settlement has been made to yield to the rights of existing creditors.
Decree unanimously affirmed.

 Note by the Judge. Here is to be observed an important difference between the language of the stat. 13 Eliz. which ours has followed, and that of the 27th Eliz. from which ours has departed. In the stat. of 27th Eliz. directed against frauds to the injury of purchasers, the preamble speaks of purchases for money or other good consideration, and the enacting part declares that fraudulent conveyances shall be void against purchasers for money or other good consideration; but the proviso exempts from the operation of the act conveyances for a good consideration and bona fule. Upon that statute, the English Courts, after much difficulty and conflict of opinion, have established the construction, that all voluntary conveyances are void against subsequent purchasers for valuable consideration, though with full notice thereof: thus treating the proviso as exempting only conveyances for valuable consideration. But our statute, (which embraces the subjects of the two statutes 13 Eliz. and 27 Eliz.) has no preamble, and the enacting j)art, makes no mention of money, and the proviso conforms to that of 13 Eliz. as well as to that of 27 Eliz., which are nearly identical. And in the construction of our statute, this Court has held that a voluntary settlement upon the grantor’s wife and children is good against a *36 purchaser for valuable consideration, with notice thereof: thus treating our proviso as embracing voluntary conveyances founded upon a meritorious, though not valuable consideration, if made bona fide. Bank of Alexandria v. Patton, 1 Rob. R. 491.